PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

DWIGHT EDWIN WHORLEY,

      *Defendant-Appellant.*

No. 06-4288

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(3:05-cr-00114-HEH)

Argued: December 4, 2007

Decided: December 18, 2008

Before NIEMEYER and GREGORY, Circuit Judges, and
James P. JONES, Chief United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge Jones joined. Judge Jones wrote a
separate concurring opinion. Judge Gregory wrote a separate
opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Robert James Wagner, Assistant Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC

DEFENDER, Richmond, Virginia, for Appellant. Damon A. King, UNITED STATES DEPARTMENT OF JUSTICE, Criminal Division, Washington, D.C., for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia; Sapna Mirchandani, Research and Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Chuck Rosenberg, United States Attorney, Sara E. Chase, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

Dwight Whorley was convicted of (1) knowingly receiving on a computer 20 obscene Japanese anime cartoons depicting minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 1462; (2) knowingly receiving, as a person previously convicted of receiving depictions of minors engaging in sexually explicit conduct, the same 20 anime cartoons, in violation of 18 U.S.C. § 1466A(a)(1); (3) knowingly receiving, as a person previously convicted of receiving depictions of minors engaging in sexually explicit conduct, 14 digital photographs depicting minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2); and (4) knowingly sending or receiving 20 obscene e-mails, in violation of 18 U.S.C. § 1462. Imposing a sentence that departed upward from the recommended Sentencing Guidelines range, the district court sentenced Whorley to 240 months' imprisonment.

On appeal, Whorley contends principally that the statutes under which he was convicted are unconstitutional. He claims (1) that § 1462 is facially unconstitutional in prohibiting receipt of obscene materials because receiving materials is an

incident of their possession, and possession of obscene materials is protected by the holding of *Stanley v. Georgia*, 394 U.S. 557 (1969); (2) that § 1462 is facially unconstitutional because the term "receives," when used in the context of a computer, is unconstitutionally vague; (3) that § 1462 is unconstitutional as applied to text-only e-mails, arguing that text alone cannot be obscene; and (4) that § 1466A(a)(1) is unconstitutional under the First Amendment, as applied to cartoons, because cartoons do not depict actual minors. In addition to his constitutional challenges, Whorley challenges numerous procedural rulings by the district court and the reasonableness of the sentence that it imposed.

Because § 1462 punishes trafficking in commerce, not the mere possession of obscene materials, and "receives" has a uniform meaning that is readily understood, we reject Whorley's facial challenges. We also reject his arguments that textual matter cannot be obscene under § 1462 and that cartoons depicting minors in sexually explicit conduct must depict real-life minors to violate § 1466A(a)(1). Finally, we reject his challenges to the district court's procedural rulings and his sentence. Accordingly, we affirm.

I

The Virginia Employment Commission maintains a public resource room in Richmond, Virginia, where job seekers may use Commission copiers, computers, and printers for employment-related purposes.

On March 30, 2004, a woman in the resource room informed a Commission employee that Dwight Whorley was viewing what appeared to be child pornography on a Commission computer. In response, the office manager and two supervisors went to the resource room and saw Whorley standing in front of the printer with papers in his hand. Upon request, Whorley showed the supervisor the documents, which depicted Japanese anime-style cartoons of children

engaged in explicit sexual conduct with adults. Determining that the documents were an inappropriate use of state computer equipment, the manager banned Whorley from using the Commission's computers and escorted him from the premises.

Returning to the computer that Whorley had been using, the Commission employees found that his YAHOO! e-mail account was still open, and they also found several more copies of anime-style cartoons by the computer. After printing off several e-mails from that account and taking the computer out of service, the manager called his supervisor and the state police. Subsequently, the manager also provided Whorley's probation officer with copies of the documents. (Whorley was on probation in connection with a previous federal conviction for downloading child pornography on a Virginia Commonwealth University computer in 1999.) Later, the FBI obtained more information from YAHOO! about Whorley's e-mail account.

Based on the matters copied, the data contained in the computer used by Whorley, and the information received from YAHOO!, a grand jury returned a 75-count indictment against Whorley. Counts 1-20 charged Whorley with using a computer on March 30, 2004, to knowingly receive obscene cartoons in interstate and foreign commerce, in violation of 18 U.S.C. § 1462. The 20 cartoons forming the basis of those counts showed prepubescent children engaging in graphic sexual acts with adults. They depicted actual intercourse, masturbation, and oral sex, some of it coerced. Based on the same cartoons, the jury also charged Whorley in Counts 21-40 under 18 U.S.C. § 1466A(a)(1) with knowingly receiving, as a person previously convicted of illegally downloading child pornography, obscene visual depictions of minors engaging in sexually explicit conduct. In addition, the grand jury charged Whorley in Counts 41-55 with knowingly receiving, on March 11 and 12, 2004, 15 visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). These counts were based on lascivious photo-

graphs of actual, naked children. Finally, the grand jury charged Whorley in Counts 56-75 with sending or receiving in interstate commerce 20 obscene e-mails during the period between February 5, 2004, and April 2, 2004, in violation of 18 U.S.C. § 1462. The e-mails described sexually explicit conduct involving children, including incest and molestation by doctors.

At trial, evidence from the Commission computer showed that Whorley conducted numerous searches on March 11 and 12, 2004, through the YAHOO! search engine, using the query "child sex play." The pictures of the naked children obtained from those searches came from an Illinois website called "Logical Reality." It also showed that on March 30, 2004, Whorley obtained the 20 Japanese cartoons from a site called "Fractal Underground Studio." On the same day, he sought eight times to open sites that had been blocked on the Commission's computers.

Following trial, the district court dismissed Count 41 for a lack of evidence that the individual depicted in the picture was a minor, and the jury convicted Whorley of the remaining 74 counts.

At sentencing, the district court granted the government's motion for an upward departure, although not to the extent sought by the government. The departure was based on numerous factors, including Whorley's history of downloading child pornography, which was not represented in the recommended Guidelines calculation because, except for the 1999 conviction, the prior conduct had not resulted in Whorley's prosecution and conviction. The court also noted Whorley's repeated failure to abide by the terms of supervised release from his prior conviction, including

> continuing to access computers without the probation officer's approval, numerous false statements concerning attempts to obtain employment, failure to

obtain employment, failure to report to the Department of Rehabilitation Services, failure to report to the Offender Aid and Restoration Program, and most disturbingly, his presence at local malls and public libraries frequented by children in direct disobedience of his probation officer's instructions.

Also contributing to the decision to depart upward was Whorley's failure "to make a good faith effort to control his sexual deviance" and the "increasingly sadistic and violent" nature of the prepubescent erotica recovered from Whorley. After increasing Whorley's criminal history from a Category III to a Category VI, the most serious category, the district court found that the base offense level of 27 still yielded a sentencing range below the mandatory minimum statutory sentence of 180 months. The court therefore moved down the sentencing table to an offense level 32, *see* U.S.S.G. § 4A1.3(a)(4)(b), and sentenced Whorley to 240 months' imprisonment, which was 60 months above the recommended Guidelines sentence but which fell within the lower half of the statutory range of 180 to 480 months.

From the judgment of conviction, this appeal followed.

## II

Whorley contends first that 18 U.S.C. § 1462 is facially unconstitutional because "it makes no exception for the private receipt, possession, or viewing of obscene material," as, he argues, such conduct is protected by the First Amendment and its application in *Stanley v. Georgia*, 394 U.S. 557 (1969). In *Stanley*, the Supreme Court held that a Georgia statute prohibiting the possession of obscene matter, even within the home, was incompatible with the First and Fourteenth Amendments. *Id.* at 568. Finding the statute too broad, the Court explained that "traditional notions of individual liberty" and the paramount importance accorded in our society to the "privacy of a person's own home" create a "right to be

free from state inquiry into the contents of [one's home] library." *Id.* at 565. Thus, the government's regulatory "power simply does not extend to mere possession [of obscene materials] by the individual in the privacy of his own home." *Id.* at 568.

But *Stanley*'s holding was a narrow one, focusing only on the *possession* of obscene materials in the privacy of one's home. The Court's holding did not prohibit the government from regulating the channels of commerce. In an unbroken line of Supreme Court decisions since *Stanley*, the Court has repeatedly rejected the notion, urged by Whorley, that as a matter of logic, because the First Amendment prohibits the criminalization of private possession of obscene materials within the home, there exists a correlative "right to receive" obscene materials. *See United States v. Reidel*, 402 U.S. 351, 354-55 (1971) (explicitly rejecting the notion that *Stanley*'s recognition of the defendant's right to possess obscenity meant that "someone must have the right to deliver it to him" through the channels of commerce (internal quotation marks omitted)); *see also Smith v. United States*, 431 U.S. 291, 307 (1977) ("*Stanley* did not create a right to receive, transport, or distribute obscene material, even though it had established the right to possess the material in the privacy of the home"); *United States v. Orito*, 413 U.S. 139, 141 (1973) (holding that *Stanley*'s tolerance of obscenity within the privacy of the home created no "correlative right to receive it, transport it, or distribute it"); *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) ("That the private user under *Stanley* may not be prosecuted for possession of obscenity in his home does not mean that he is entitled to import it from abroad free from the power of Congress to exclude noxious articles from commerce").

And § 1462 falls squarely within this line of cases authorizing the regulation and prohibition of obscene materials in commerce. It provides:

> Whoever brings into the United States . . . or knowingly uses any express company or other common carrier or interactive computer service . . . for carriage in interstate or foreign commerce —
>
> (a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or
>
> * * *
>
> Whoever knowingly takes or receives, from such express company or other common carrier or interactive computer service . . . any matter or thing the carriage or importation of which is herein made unlawful —
>
> Shall be fined under this title or imprisoned not more than five years . . . .

18 U.S.C. § 1462. The focus of the statute's prohibition is on the movement of obscene matter in interstate commerce, not its possession in the home. This is manifested by the statute's prohibition of receiving obscene material from any "express company," "common carrier," or "interactive computer service." By focusing on the movement of obscene material in channels of commerce, and not on its mere possession, § 1462 is not governed by *Stanley*, but rather is akin to the *Reidel* line of cases decided after *Stanley*. Accordingly, we reject Whorley's constitutional argument based on *Stanley*.

## III

Whorley contends also that § 1462 is facially unconstitutional because its use of the word "receives" in prohibiting the receipt of obscene matter using instruments of interstate commerce makes the prohibition impermissibly vague in the con-

text of receiving obscene matter from an interactive computer service. He maintains that "receives" is so broad that the statute ensnares the unwitting recipient of obscenity, such as one who innocently receives an "obscene textual message [sent] to a person's e-mail account" from a malicious third party, or finds to his dismay that an obscene image appears "as a 'pop-up ad' or as part of a paid sponsor's rotating advertisement." Consequently, he argues that "§ 1462 fails to give notice to the average person of when criminal liability attaches."

"A statute is impermissibly vague if it either (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Stated differently, a court considering a vagueness challenge must determine if the statutory prohibitions "'are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'" *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973) (quoting *United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 579 (1973)).

In this case, Whorley's argument, when analyzed more closely, in fact suggests no vagueness or misunderstanding about the scope of the word "receives." Giving that term its ordinary meaning, *see Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995), his argument assumes that "receives" means to "come into possession of," to "acquire," or "to have delivered or brought to one," *see* Merriam-Webster's Collegiate Dictionary 975 (10th ed. 1994); Webster's Third New International Dictionary 1894 (3d ed. 1993); Random House Dictionary of the English Language 1610 (2d ed. 1987). As he articulates it, Whorley's complaint about receiving obscene material unwittingly—i.e., without an intent to receive it— does not find confusion in the word "receives," but rather in the type of intent with which one can "receive" something. To

be sure, one can "receive" obscene materials intentionally and knowingly, or negligently, or by mistake or accident. Section 1462, however, does not criminalize every receipt of obscene materials, but only the "knowing" receipt of them. It is thus apparent that in making his argument that "receives" is too vague, Whorley actually confuses *mens rea* with the question of whether the word "receives" itself is without sufficient meaning to be readily understood.

Whorley is probably correct in observing that evolving computer technology will constantly change the ways in which a person's computer may be used to "receive" obscene material from an interactive computer service and that those changes might, depending on the technology, present serious questions as to whether such material can be said to have been "received." But no such question exists here where Whorley actively used a computer to solicit obscene material through numerous and repetitive searches and ultimately succeeded in obtaining the materials he sought. Moreover, while the facts of each case will require a jury to determine whether an individual has, in fact, "knowingly received" obscene matter, the need for such a determination by the jury does not suggest that a statute is too vague. A statute need not spell out every possible factual scenario with "'celestial precision'" to avoid being struck down on vagueness grounds. *See Vernon Beigay, Inc. v. Traxler*, 790 F.2d 1088, 1093 (4th Cir. 1986) (quoting *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 833 (4th Cir. 1979)).

We conclude that the ordinary meaning of the term "receives" is sufficiently precise in § 1462 to provide adequate notice to a person of ordinary intelligence of the conduct that Congress has prohibited.

IV

In addition to his facial challenges to 18 U.S.C. § 1462, Whorley contends that the statute is unconstitutional as

applied to the facts underlying Counts 1-20 (charging him with receiving obscene cartoons) and Counts 56-75 (charging him with receiving obscene e-mails), because he did not know that cartoons and text-only e-mails lacked the protection of the First Amendment.

With respect to his argument on Counts 1-20, he states:

> The statute is unconstitutional as applied to these counts for the same reasons discussed above. . . . Moreover, [Whorley] had no notice that viewing the cartoon images on the computer screen was unlawful. . . . Indeed, according to the government's own witnesses, prior to March 2004, [Whorley] had used the [Virginia Employment Commission] computer room (which sometimes was monitored by a [Virginia Employment Commission] employee) to access pornographic web-sites on several occasions, all without incident.

To the extent that this challenge parallels Whorley's facial challenges, it fails for the same reasons they did. Thus, whatever protection *Stanley* may have afforded to the *possession* of obscene matter in the privacy of the home, it cannot be said to have created a right to "receive" obscene materials using instruments of commerce. And to the extent that this challenge is based on Whorley's ignorance of the law or his belief that his similar conduct in the past should somehow provide him a defense, the claim is frivolous. *See Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system").

Whorley makes an as-applied challenge also with respect to Counts 56-75 on the basis that e-mails are only textual and therefore cannot be obscene. He argues:

> It is undisputed that the e-mails for which [Whorley] was convicted were pure speech; that is, they did not

include any obscene visual depictions, nor were they accompanied by attachments containing obscene material. For this reason, even the district court found the government's allegations in Counts 56 through 75 troubling.

In essence, Whorley argues that text, standing alone, may not constitutionally be prohibited as obscene. He never explains why, however, nor does he cite any authority for his argument. Indeed, he overlooks the traditional formulations of obscenity, which have never depended on the form or medium of expression.

In *Miller v. California*, 413 U.S. 15, 24 (1973), the Court defined obscenity in the context of "works," which "taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." And in *Kaplan v. California*, 413 U.S. 115, 119 (1973), which was decided the same day as *Miller*, the Court made clear that "works" include both pictorial representations and words:

> Obscenity can, of course, manifest itself in conduct, in the pictorial representation of conduct, or in the written and oral description of conduct. The Court has applied similarly conceived First Amendment standards to moving pictures, to photographs, and to words in books.

The Court there affirmed the conviction of a book store proprietor who sold a book made up "entirely of repetitive descriptions of physical, sexual conduct, 'clinically' explicit and offensive to the point of being nauseous[, with] only the most tenuous 'plot.' Almost every conceivable variety of sexual contact, homosexual and heterosexual, [was] described." *Id.* at 116-117.

Accordingly, Whorley's arguments that 18 U.S.C. § 1462 is unconstitutional as applied to the cartoons and e-mails charged in Counts 1-20 and Counts 56-75 are readily rejected.

V

Whorley next contends that 18 U.S.C. § 1466A(a)(1) is unconstitutional as applied to the cartoon drawings that formed the basis for the charges in Counts 21-40 because cartoon figures are not depictions of *actual* people. He argues that § 1466A(a)(1) necessarily requires that the visual depictions be of actual minors and that if the depiction of an actual minor is not required, then § 1466A(a)(1) would be unconstitutional on its face under *New York v. Ferber*, 458 U.S. 747, 773-74 (1982) (upholding state statute that prohibited depictions of actual children engaged in sexual conduct, regardless of whether the depictions are obscene), and *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 241, 246-47, 249-51, 254-56 (2002) (holding that a statutory provision prohibiting any visual depiction that "is, or appears to be, of a minor engaging in sexually explicit conduct" violated the First Amendment insofar as it prohibited virtual imagery of minors that was neither obscene nor involved actual children). To make his argument, Whorley points out that subsection (a)(1) (prohibiting depictions of "a minor engaging in sexually explicit conduct") is mirrored in subsection (a)(2) (prohibiting "an image that is, or appears to be, of a minor"). *See* 18 U.S.C. § 1466A(a)(1), (a)(2). He argues that the "appears to be" language in subsection (a)(2) indicates reference to a real minor in subsection (a)(1). In addition, he contends that subsection (a)(1) prohibits material depicting "sexually explicit conduct," which is defined in 18 U.S.C. § 2256 as referring to real people. Section 2256 defines "sexually explicit conduct" in part as actual or simulated sexual intercourse, "whether between *persons* of the same or opposite sex." 18 U.S.C. § 2256(2)(A) (emphasis added).

In making his argument, however, Whorley focuses too narrowly on isolated portions of § 1466A(a)(1). While § 1466A(a)(1) would clearly prohibit an obscene photographic depiction of an actual minor engaging in sexually explicit conduct, it also criminalizes receipt of "*a visual depiction of any kind*, including a *drawing, cartoon*, sculpture, or painting," that "depicts a minor engaging in sexually explicit conduct" and is obscene. *Id.* § 1466A(a)(1) (emphasis added). In addition, Whorley overlooks § 1466A(c), which unambiguously states that "[i]t is not a required element of any offense under this section that the minor depicted actually exist." 18 U.S.C. § 1466A(c). The clear language of § 1466A(a)(1) and § 1466A(c) is sufficiently broad to prohibit receipt of obscene cartoons, as charged in Counts 21-40.[1]

This leaves Whorley with the argument that if an actual minor is not required to be depicted in § 1466A(a)(1), then the

---

[1]Section 1466A, which was added to Title 18 by the PROTECT Act of 2003, Pub. L. No. 108-21, § 504, 117 Stat. 650, 680-82 (2003), criminalizes the possession, sale, distribution, and receipt of specific sexually explicit visual representations of minors. The relevant portions of the statute provide:

(a) **In general**.—Any person who . . . knowingly . . . receives . . . a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting, that —

    (1)   (A)   depicts a minor engaging in sexually explicit conduct; and

        (B)   is obscene;

\* \* \*

shall be subject to the penalties provided in [18 U.S.C. § 2252A(b)(1)], including the penalties provided for cases involving a prior conviction.

\* \* \*

(c)  **Nonrequired element of offense.**—It is not a required element of any offense under this section that the minor depicted actually exist.

18 U.S.C. § 1466A(a), (c).

statute is unconstitutional under *New York v. Ferber* and *Ashcroft v. Free Speech Coalition*. There is, of course, no suggestion that the cartoons in this case depict actual children; they were cartoons. Relying specifically on *Ashcroft v. Free Speech Coalition*, Whorley points to the observation made in that opinion that the First Amendment does not protect "defamation, incitement, obscenity, and pornography produced with *real children*," but that a ban on *non-obscene* material that did not use real children was impermissibly overbroad. *Ashcroft*, 535 U.S. at 245-46 (emphasis added). The Court in *Ashcroft* noted further that *New York v. Ferber* "provide[d] no support for a statute that eliminates the distinction [between actual and virtual child pornography]." *Id.* at 251. Thus, he asserts that the First Amendment protects non-obscene pornography that does not depict real children.

But in making his argument, Whorley ignores the language of § 1466A(a)(1), which prohibits visual depictions of minors only when they are *obscene*. *See* 18 U.S.C. § 1466A(a)(1)(B). *Ashcroft* itself noted that obscenity in any form is not protected by the First Amendment. *See Ashcroft*, 535 U.S. at 245-46; *see also Miller*, 413 U.S. at 24; *Kaplan*, 413 U.S. at 119. Thus, regardless of whether § 1466A(a)(1) requires an actual minor, it is nonetheless a valid restriction on *obscene speech* under *Miller*, not a restriction on non-obscene pornography of the type permitted by *Ferber*. We thus find Whorley's as-applied constitutional challenge to § 1466A(a)(1) to be without merit.[2]

## VI

In addition to his constitutional arguments, Whorley challenges numerous procedural rulings of the district court. None, however, requires extensive discussion.

---

[2]Whorley also challenges the constitutionality of 18 U.S.C. §§ 1466A(a)(2), (b)(1), and (b)(2). Because Whorley was not convicted of offenses under those provisions, we decline to address his challenges to them.

### A

First, Whorley contends for the first time on appeal that the e-mails that formed the basis of Counts 56-75, which were provided by YAHOO! in response to a government subpoena, were obtained in violation of his Fourth Amendment right against unreasonable searches. We conclude, however, that Whorley has waived the right to assert this objection by failing to object to the search before trial. *See* Fed. R. Crim. P. 12(b)(3)(C); *id.* 12(c); *United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997); *United States v. Ricco*, 52 F.3d 58, 62 (4th Cir. 1995).

### B

Whorley next contends that the district court abused its discretion in admitting, over his objection, evidence of his prior conviction for child pornography and the terms of his probation, which prohibited him from possessing pornography. The evidence was introduced in the form of the following stipulation:

> On July 23, 1999, Dwight Edwin Whorley was convicted of receiving child pornography. On July 24, 2002, the defendant, Dwight Edwin Whorley, was instructed by a probation officer, David Guertler, that the defendant shall not possess, view, and/or have access to any pornographic materials, pictures displaying nudity, or any magazines using young juvenile models or pictures of juvenile models, as directed by the probation officer.

Whorley contends that the stipulation was improper character evidence because it was not necessary to prove any element of the charged offense. He argues: "Neither his knowledge nor intent were in issue. In fact, [Whorley] informed the court, he planned to concede at trial that he knowingly entered the web site." Whorley argues further that it should have been

excluded "because the danger of causing undue prejudice far outweighed any potential probative value." *See* Fed. R. Evid. 403.

First, insofar as the stipulation includes evidence of Whorley's prior conviction, it was arguably relevant to the charges in Counts 21-40 and 42-55, where the government charged that Whorley had previously been convicted for violations of 18 U.S.C. § 2252 to justify enhanced sentences for violations of §§ 1466A(a)(1) and 2252(a)(2).

In addition, Federal Rule of Evidence 404(b) allows the admission of such evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b); *see also United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997). The government introduced the evidence of Whorley's prior conviction and terms of probation to establish that Whorley received the charged images knowingly, not by accident or mistake, while surfing the Internet and that he had knowledge that the individuals depicted in Counts 41-55 were minors. Moreover, the record contradicts Whorley's assertion that these issues were not genuinely in dispute. Although Whorley was willing to stipulate that he knowingly entered the websites containing the charged images, he was not willing to concede that he knowingly received the charged images themselves or that he knew that the individuals in the images charged in Counts 41-55 were minors. The stipulation was probative on these disputed elements of the offenses.

Further, the district court made clear that it had weighed the danger of unfair prejudice inherent in introducing Whorley's past conduct. Indeed, for that precise reason, the court did in fact exclude certain other prior bad acts evidence. But with respect to the stipulation, the court found that the risk of unfair prejudice was outweighed by the probative value of the evidence. And to reduce the risk of prejudice, the court gave the jury a limiting instruction. *See Queen*, 132 F.3d at 997.

In these circumstances, we conclude that the district court did not abuse its discretion in admitting the evidence.

C

Whorley also contends that the district court erred by failing to provide the jury with a particular instruction that he requested, elaborating on *Miller*'s requirement that both the prurient appeal and the literary, artistic, political, or scientific value of the allegedly obscene item be evaluated as to the work "as a whole." *Miller*, 413 U.S. at 24. We have examined the district court's charge to the jury concerning obscenity, including its complete and detailed instructions concerning each element of the *Miller* obscenity standard, and find that the court did not abuse its discretion by refusing to provide Whorley's additional instruction. *See United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995).

D

Whorley next contends that the government failed to produce evidence sufficient to allow a rational jury to find Whorley guilty beyond a reasonable doubt. In reviewing the sufficiency of the evidence, "our role is limited to considering whether there is substantial evidence, taking the view most favorable to the Government, to support the conviction." *United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007) (internal quotation marks omitted). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). Whorley's sufficiency arguments are based largely on his interpretations of 18 U.S.C. §§ 1462 and 1466A, which we have rejected above. Having carefully considered the trial record in light of his arguments, we find that each of the offenses for which Whorley was convicted was adequately supported by the evidence before the jury.

### E

On a collateral issue, Whorley contends that the district judge, who in 1986 chaired the Federal Attorney General's Commission on Pornography while serving as a Commonwealth's Attorney for Virginia, abused his discretion in denying Whorley's motion that the judge recuse himself. The district judge denied the motion as untimely.

During arraignment, the district judge advised counsel that he had chaired the Commission and requested notice of whether recusal on that basis would be sought. Whorley's counsel subsequently notified the court that Whorley did not intend to request recusal. But then, on the last business day before trial, some seven months after Whorley's arraignment, Whorley filed the motion to recuse. Whorley explained that he had only become aware on the day before trial that the district judge had been involved in recommending and drafting child pornography legislation.

We review the district judge's decision to deny a recusal motion for abuse of discretion. *United States v. DeTemple*, 162 F.3d 279, 283 (4th Cir. 1998). In this case we find no abuse of discretion in the judge's denial of Whorley's motion as untimely filed, as "[t]imeliness is an essential element of a recusal motion." *United States v. Owens*, 902 F.2d 1154, 1155 (4th Cir. 1990). To prevent inefficiency and delay, "motions to recuse must be filed at the first opportunity after discovery of the facts tending to prove disqualification." *Sine v. Local No. 992 Int'l Bhd. of Teamsters*, 882 F.2d 913, 915 (4th Cir. 1989).

The facts underlying Whorley's motion were available to him as a matter of public record at the time of his arraignment, and he has shown no cause excusing his failure to seek recusal before the eve of trial. By then, the court and the parties had invested substantial time and effort in litigating the complex pretrial questions that Whorley raised, particularly

his claims that the statutes involved were unconstitutional. Whorley's lack of diligence in determining whether the Commission on Pornography's work included child pornography does not excuse his last-minute motion, especially after he argued the complex constitutional issues in the case and the court decided them. We find no abuse of discretion in the court's denying that motion.

## VII

Finally, Whorley contends that the district court abused its discretion by departing upward to impose a sentence of 240 months' imprisonment. He argues that the district court acted unreasonably in imposing a sentence nearly 250% greater than that specified by the advisory Sentencing Guidelines because this case does not present "any circumstance that either is atypical or was not already taken into account by the sentencing guidelines." He maintains: (1) that even though the cartoon images involved in this case depicted children engaging in sexually explicit conduct with adults, they "were simply *drawings* . . . represent[ing] the fictional work of an artist, not a factual recording of sexual exploitation of a child"; (2) that the pictures of naked minors involved in this case did not show any of them "touching themselves, each other, or an adult"; and (3) that most of the obscene e-mails involved in this case were written *to* Whorley by another consenting adult, and only one was written and sent *by* Whorley. In short, Whorley contends that his offenses "can be only described as substantially *below* the seriousness ordinarily involved in this kind of offense."

At the outset, we should correct Whorley's premise that the upward departure represented a "nearly 250%" increase over that specified by the Sentencing Guidelines. While an interim calculation for Whorley's conduct did yield a sentencing range of 87 to 109 months' imprisonment, Whorley overlooked the fact that under the Guidelines, the final calculation must be adjusted upward when a statutory minimum sentence

is greater, so that "the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(b). In this case, the mandatory minimum sentence for each of Counts 21-40 and 42-55 was 180 months' imprisonment, and the maximum for each of those counts was 480 months' imprisonment. *See* 18 U.S.C. §§ 1466A(a), 2252A(b)(1). Thus, the 240-month sentence imposed by the district court was an increase of 33% above the Guideline sentence of 180 months' imprisonment.

Also, the record shows that Whorley's conduct, as relevant to sentencing, did indeed present circumstances that were atypical and not taken into account by the Sentencing Guidelines. The facts relied on by Whorley to challenge the seriousness of his offense—that cartoons, not real persons, were involved; that there was no touching in photographs; and that Whorley received, rather than sent, most of the obscene e-mails—are statutorily irrelevant. His challenge on those bases is, in effect, a challenge to Congress' policies in defining the offenses for which he was convicted.

Whorley was first arrested in December 1998 for receiving and distributing visual depictions of minors engaging in sexually explicit conduct. Over the period of several weeks, Whorley had been receiving and sending pictures, using computers at the Virginia Commonwealth University, that depicted 9 or 10-year-old females having sexual intercourse and performing other sexual acts with males approximately 25 to 30 years old. Upon his arrest, police seized extensive amounts of child pornography, as well as books related to child abuse prevention, incest, and children killing or being killed, including horror stories of children's deaths; medical evaluations of preteen patients; and e-mails related to child pornography. Whorley was sentenced to 46 months' imprisonment.

Within months after his release in April 2002, Whorley was charged with violating the terms of his supervised released for viewing adult pornography at the Richmond Career Advance-

ment Center. Six months later, Whorley was charged again with using a computer without the approval of his probation officer. And yet again, two months later, on March 14, 2003, Whorley was charged with violating the terms of his supervised release for his unauthorized use of a computer and falsely reporting his efforts to obtain employment. The court finally revoked his supervised release and again imprisoned him.

On January 29, 2004, Whorley was again released from prison, and *within two weeks*, he was receiving and distributing child pornography. From February to April 2004, Whorley received or distributed obscene matter and child pornography on 20 different days, for which he was indicted in this case. The grand jury indicted him on 75 felony counts.

Psychological evaluations of Whorley performed in June 1999 and again in June 2002 found Whorley to meet the "formal DSM-IV criteria for the mental illness of Pedophilia." During the course of these evaluations, Whorley stated and admitted "that he 'is scared' of his sexual urges toward female children and his 'potential of hurting a child,'" although he also expressed belief that he could control his sexual behavior. Another report of an evaluation performed in August 2002 indicated that Whorley "does appear to be at least at risk to continue to access and possess child pornography."

After a jury convicted Whorley in this case on 74 felony counts, 33 of which included a minimum sentence of 15 years and a maximum sentence of 40 years' imprisonment, the probation officer indicated that an upward departure from the 15-year recommended sentence "may be warranted based upon the defendant's criminal history not adequately reflecting the seriousness of his past criminal conduct." Also, the government filed a motion for an upward departure to a sentencing range of 262 to 327 months' imprisonment.

Following an extensive sentencing hearing, the district court granted the government's motion, but not in full. The

court sentenced Whorley to 240 months' imprisonment, a 33% increase over the 180-month sentence recommended by the Sentencing Guidelines. The court found that a number of circumstances took the case out of the heartland of the Guidelines sentence:

1. The defendant has engaged in a continuing course of prior similar conduct, much of which did not result in criminal convictions and is not reflected in his criminal history category.

2. Despite having twice been found in violation of the conditions of his supervised release and reincarcerated, this Defendant continues to virtually disregard the directions of the United States Probation Officer. The defendant has received at least five (5) notices of violation containing at least eighteen (18) instances of his failure to obey the conditions of supervised release. These violations include continuing to access computers without the probation officer's approval, numerous false statements concerning attempts to obtain employment, failure to obtain employment, failure to report to the Department of Rehabilitation Services, failure to report to the Offender Aid and Restoration Program, and most disturbingly, his presence at local malls and public libraries frequented by children in direct disobedience of his probation officer's instructions.

3. The defendant has derived no benefit from previous rehabilitative programs. He has failed to make a good faith effort to control his sexual deviance.

4. The volume of material recovered from the defendant demonstrates an escalating interest in prepubescent erotica.

    5.   The materials in Defendant's possession appear to be increasing[ly] sadistic and violent in nature.

The court concluded that this history of Whorley's conduct provided a picture of "a diagnosed pedophile who is resistant to any type of rehabilitation or behavioral correction."

Applying the Sentencing Guidelines, the district court relied on two encouraged factors for upward departure: "[s]ubstantial underrepresentation of criminal history and likelihood of continuing criminal conduct under U.S.S.G. 4A1.3[(a)(1)], and prior similar conduct not resulting in criminal conviction, under U.S.S.G. 4A1.3[(a)](2)(E)." The court also relied on Whorley's background to conclude that the total offense level provided by the Guidelines did "not adequately account for the atypical circumstances in this case."

In addition to its analysis under the Sentencing Guidelines, the district court conducted an analysis under 18 U.S.C. § 3553(a), stating that it had considered

> the nature and circumstances of the offense and the history and characteristics of the defendant, as required by Title 18 U.S.C. § 3553(a). The Court believes that a sentence within the 210 to 262 month range fulfills the congressionally established objectives for sentencing. In this case, not only would it provide just punishment for the offense, but would afford adequate deterrence and protect the public from further criminal activity from the defendant.

In short, the district court based its upward departure on (1) Whorley's extensive history of downloading child pornography, which was not, except for his 1999 conviction, represented in the recommended Guidelines calculation; (2) his repeated disobedience of court orders attempting to regulate his deviant conduct; (3) his almost continuous pursuit of crim-

inal conduct—virtually without a break since 1998—and its increasing risk to the public; and (4) his failure to show any progress in reforming his conduct. Even with the departure, however, Whorley's 240-month sentence remains in the *lower half* of the statutory range of 180 to 480 months, the midpoint being 330 months.

The district court's consideration of Whorley's sentence in this case was thorough, and the sentence it imposed was amply supported by the facts and by legally appropriate considerations. In these circumstances, we cannot agree with Whorley that the district court abused its discretion and acted unreasonably.

In *Gall v. United States*, 128 S. Ct. 586 (2007), the Supreme Court repeatedly instructed that appellate courts defer in these circumstances. With respect to a departure or variance sentence, such as before us, the Court stated:

> [The appellate court] may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

*Gall*, 128 S. Ct. at 597. Repeating these instructions, the Court stated:

> But it is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable. On abuse-of-discretion review, the Court of Appeals should have given due deference to the District Court's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence.

*Id.* at 602. *See also United States v. Pauley*, 511 F.3d 468, 473-74 (4th Cir. 2007). In following these instructions, we have affirmed departures encompassing the range involved here. *See, e.g.*, *United States v. Evans*, 526 F.3d 155, 161-66 (4th Cir. 2008) (affirming a 316% upward variance); *United States v. Curry*, 523 F.3d 436, 439-41 (4th Cir. 2008) (affirming a 13% downward departure); *Pauley*, 511 F.3d at 474-76 (affirming a 46% downward departure). In *Evans*, we noted, "We recognize that the sentence [constituting a 316% variance] imposed on Evans may not be the only reasonable sentence, but it is *a* reasonable sentence, and the Supreme Court [in *Gall*] has directed that any reasonable sentence be upheld." 526 F.3d at 166.

In this case, we are presented with no procedural or substantive errors in the district court's determination that the goals of federal sentencing were best served by the 240-month sentence, and therefore we conclude that the sentence was not unreasonable.

The judgment of the district court is accordingly

*AFFIRMED*.

JONES, Chief District Judge, concurring:

While I share some disquiet regarding Whorley's convictions for sending and receiving the e-mails in question, I must note that there is no contention in this case that the e-mails were not obscene under the traditional test established by the Supreme Court. *See Miller v. California*, 413 U.S. 15, 24-25 (1973). Rather, the argument made is that "[p]rivate e-mails between consenting adults should at least be accorded the substantive due process privacy protections that obscene materials viewed privately and sexual acts between consenting adults are provided." (Appellant's Reply Br. 26.) I agree with Judge Niemeyer that there is no support in the law for this proposition or the related argument that since the obscen-

ity in the e-mails consisted of "mere words" (*Id.*), they cannot be the subject of prosecution.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

The ability to consider and transmit thoughts and ideas through the medium of the written word is an attribute unique to humans. The Universal Declaration of Human Rights provides that freedom of speech is "the highest aspiration of the common people." Universal Declaration of Human Rights, Dec. 10, 1948, Preamble, G.A. Res. 217A(III), 3 U.N. GAOR Supp. No. 16, U.N. Doc. A/810 (1948). Indeed, "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds," *Stanley v. Georgia*, 394 U.S. 557, 565 (1969), and simply because "society may find speech offensive is not a sufficient reason for suppressing it." *FCC v. Pacifica Foundation*, 438 U.S. 726, 745 (1978). Because suppression of purely textual e-mails discussing the child sex fantasies of consenting adults is protected speech, the regulation of which is unsupported by the economic and moral concerns implicated in suppressing child pornography that uses actual children, the application of 18 U.S.C. § 1462 to Whorley violates the First Amendment. Consequently, I would reverse Whorley's convictions as to counts fifty-six (56) through seventy-five (75). In addition, because the Japanese anime cartoons did not portray actual children, a requirement of 18 U.S.C. § 1466A(a)(1), I would reverse Whorley's conviction as to counts twenty-one (21) through forty (40). I concur in the majority's judgment (unless otherwise indicated) as to the remaining issues.

I.

"[A]lmost every obscenity case involves difficult constitutional issues." *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 379 (1971) (Black, J., dissenting). This case is no exception. Whorley was indicted and convicted,

*inter alia*, for receiving obscene cartoons and receiving and sending obscene e-mails. In the six decades since the Supreme Court first agreed that the federal and state governments could regulate obscene matter, it has struggled to define obscenity. *See Miller v. California*, 413 U.S. 15, 22 (1973) ("We have seen a variety of views among the members of the Court [on the issue of defining obscenity that is] unmatched in any other course of constitutional adjudication.") (internal quotation marks and citation omitted).

The Supreme Court's initial foray into the obscenity thicket led to a splintered decision on whether obscenity is protected by the First Amendment. In *United States v. Roth*, 354 U.S. 476 (1957), the majority of the Supreme Court agreed that obscene material cannot find refuge within the First Amendment. The Court defined obscene material as that "which deals with sex in a manner appealing to prurient interest," *id.* at 487, or more specifically, "having a tendency to excite lustful thoughts." *Id.* at 488, n.20. (1957); *see also United States v. Reidel*, 402 U.S. 351, 354 (1971); *but cf. Roth*, 354 U.S. at 514 (Douglas, J., dissenting, joined by Black, J.) (rejecting the majority's decision to strip the protections of the First Amendment from obscene material because "the test that suppresses a cheap tract today can suppress a literary gem tomorrow" and expressing "the same confidence in the ability of our people to reject noxious literature as [we] have in their capacity to sort out the true from the false in theology, economics, politics, or any other field").

In *Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts*, 383 U.S. 413 (1966) (plurality opinion), a sharply divided Supreme Court "drastically altered" the *Roth* obscenity test by requiring the Government to not only prove that the material appealed to the prurient interest and that it was patently offensive, but also "called on the prosecution to prove a negative, i.e., that the material was utterly without redeeming social value—a burden virtually impossible to discharge under our criminal standards of

proof." *Miller*, 413 U.S. at 22 (internal quotation marks and citation omitted).

A decade and a half after it first attempted to define obscenity, the Supreme Court candidly admitted that its definition of obscenity "does not reflect the precise meaning of 'obscene' as traditionally used in the English language." *Id.* at 20, n.2. In order to provide relief from the "somewhat tortured history of the Court's obscenity decisions," *id.* at 20, the *Miller* court devised a "more concrete," *id.*, test to aid the finder of fact in identifying obscenity:

> (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24 (internal quotation marks and internal citations omitted). This well-intentioned attempt at tethering the task of defining what material is obscene to firmer guideposts did not "extricate [the Supreme Court] from the mire of case-by-case determinations of obscenity," *Jenkins v. Georgia*, 418 U.S. 153, 162 (1974) (Brennan, J., concurring in the result), for courts have continued to engage in an "essentially pointless exercise, in view of the need for an ultimate decision by th[e] [Supreme] Court." *Id.* at 163.

The distinct but related issues of a state's regulation of obscenity and child pornography were addressed in *New York v. Ferber*, 458 U.S. 747 (1982), where the Supreme Court held that the State of New York could ban child pornography that used real children in "*live performance* or *photographic* or other *visual* reproduction of live performances" without impinging upon the First Amendment. *Id.* at 765 (emphasis

added). Unlike the *Miller* test for obscenity, the test for child pornography does not require the Government to prove that "the material appeals to the prurient interest of the average person" or that the "sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole." *Id.* at 764. The Supreme Court reasoned that the ban on visual depictions of child pornography involving real children did not offend the Constitution because: the "sexual exploitation and abuse of children constitutes a government objective of surpassing importance," *id.* at 757; the distribution of such material "is intrinsically related to the sexual abuse of children," *id.* at 759; the need to circumscribe "the economic motive" of those involved in advertising and selling such materials, *id.* at 761; the value of children "engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*," *id.* at 762 (emphasis in original); and placing child pornography in the "category of material outside the protection of the First Amendment is not, incompatible with our earlier decisions." *Id.* at 763.

The *Ferber* plurality and several of the concurring justices recognized that the New York statute in question regulated a "tiny fraction," *id.* at 773, of speech that continued to be protected by the First Amendment — e.g., child pornography that has a serious literary, artistic, political, or scientific value. *See, e.g., Id.* ("[T]he Court of Appeals was understandably concerned that some protected expression . . . would fall prey to the statute."); *see also id.* at 776 (Brennan, J., concurring in the judgment, joined by Marshall, J.) ("But in my view application of [the New York statute] or any similar statute to depictions of children that in themselves do have serious literary, artistic, scientific, or medical value, would violate the First Amendment."). Finally, and most important for our purposes, Justice O'Connor pointed out that while New York's statute forbid *portraying* real children in sexual situations, she concluded that the statute "*does not attempt to suppress the communication of particular ideas.*" *Id.* at 775 (O'Connor, J.,

concurring) (internal quotation marks and citation omitted) (emphasis added).

The Supreme Court extended the reach of *Ferber* in *Osborne v. Ohio*, 495 U.S. 103 (1990), holding that while *Stanley* continued to protect a person's right to possess obscenity in the confines of his or her home, child pornography depicting real children would be excepted. The Supreme Court also found that the State of Ohio's interest in "safeguarding the physical and psychological well-being of a minor is compelling," *Osborne*, 495 U.S. at 109 (internal quotation marks and citation omitted), when contrasted with the "weak interests asserted by the State [of Georgia]," *id.* at 110, in *Stanley*.[1] Thus, Ohio's statutory prohibition on "possession and viewing of child pornography," *id.* at 108, survived constitutional scrutiny.

Finally, in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), the Supreme Court found two sections of the Child Pornography Prevention Act of 1996 ("CPPA"), 18 U.S.C. § 2251 *et seq.*, to be overbroad because they banned "a significant universe of speech that is neither obscene under *Miller* nor child pornography under *Ferber*," *id.* at 240, including sexually explicit images of virtual children. *See also id.* ("By prohibiting child pornography that does not depict an actual child, the statute goes beyond [*Ferber*]. . . ."). The CPPA could be distinguished from the New York statute at issue in *Ferber* because "[t]he production of the work, not its content, was the target of the [New York] statute." *Id.* at 249. Despite the Government's contention that child pornography, even without real children, "whets the appetites of pedophiles and encourages them to engage in illegal conduct," *id.* at 253, the Supreme Court held that "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning

---

[1]"In *Stanley*, Georgia primarily sought to proscribe the private possession of obscenity because it was concerned that obscenity would poison the minds of its viewers." *Osborne*, 495 U.S. at 109 (citation omitted).

it." *Id.* In striking down portions of the CPPA, the Court was unwilling to go beyond the *Ferber*/*Miller* holdings and place all child pornography — including depictions and writings that do not involve the sexual abuse of actual children — beyond the protections of the First Amendment.

The Supreme Court's attempts to define obscenity for over half a century, including its enunciation of differing standards for obscenity and child pornography, reveal one truth: a material's obscenity, or lack thereof, ultimately depends on the subjective view of at least five individuals. *See U.S. v. 12200-Foot Reels of Super 8mm Film*, 413 U.S. 123, 137 (1973) (Douglas, J., dissenting) ("Moreover, by what right under the Constitution do five of us have to impose our set of values on the literature of the day?"). Predicting how any person subjectively views material is impossible, an infallible truth that prompted Justice Stewart to pronounce a simple, yet honest test for identifying obscenity: "I know it when I see it . . . ." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

On the other hand, in every society, there are fundamental norms of decency and morality that cannot be transgressed if that society is to function in a healthy and productive manner. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 57-58 (1973) (holding that "the interest of the public in the quality of life and the total community environment and . . . possibly, the public safety itself" is implicated in "stemming the tide of commercialized obscenity"). Allowing children to live in an environment free from the paws of predatory pedophiles is a paramount objective of our society. *See Ferber*, 458 U.S. at 776 (Brennan, J., concurring in judgment) ("[T]he State has a special interest in protecting the well-being of its youth."); *see also Paris Adult Theatre I*, 413 U.S. at 59-60 ("[T]here is a right of the Nation and of the States to maintain a decent society.") (internal quotation marks, ellipsis, and citation omitted).

II.

A.

Here, Whorley argues that 18 U.S.C. § 1462 is facially unconstitutional because it is overbroad, vague, and violates the First Amendment. His arguments must fail. Whorley's claim that the statute is overbroad and might chill otherwise protected speech, is disconcerting because the locus of Whorley's activity — i.e., his place of work — played a significant role in the criminalization of his activities. Indeed, excepting the digital pictures of the actual children, Whorley could have possessed hard copies of the cartoons and e-mails in his home without any fear of conviction under § 1462 because the materials only portrayed and discussed fictional children. Nevertheless, because *Stanley*'s holding is limited to the confines of one's home, I reject Whorley's contention that he is entitled to view obscenity in the workplace for the reasons articulated in the majority opinion. (*See* Maj. Op. 6-8.) And while determining when a person surfing the internet "receives" an image or document is not without its difficulties, a point not lost on the majority (*See* Maj. Op. 10), I agree that Whorley's vagueness argument must also fail.

B.

Whorley was indicted under § 1462 for two discrete issues — (1) receiving cartoons depicting fictional children having sex with adults, and (2) exchanging allegedly obscene e-mails discussing his child sex fantasies. Whorley contends that § 1462 is overbroad, vague, and violates the First Amendment, as applied to him.

i.

For the reasons expressed in Section I(A), Whorley's as applied constitutional challenge must fail as to the cartoons. While I join the majority's analysis as to this issue, I wish to

add my thoughts on Whorley's argument that *Free Speech Coalition* supports his claim that the statute is unconstitutional as applied to him because, *inter alia*, the children in the cartoons were not real. Whorley's claim distorts *Free Speech Coalition* which struck down the CPPA on overbreadth grounds because "[v]irtual child pornography [unlike pornography involving real children] is not 'intrinsically related' to the sexual abuse of children." *Free Speech Coalition*, 535 U.S. at 250 (internal citation omitted). As a result, the Supreme Court rejected a complete ban on child pornography that does not involve real children, although such pornography — as with pornography involving adults — can be found to be obscene. Thus, the jury's finding that the graphic cartoons of fictional children being raped and sodomized by adults are obscene should not be disturbed because a cartoon does not have to contain actual children in order to be obscene.

ii.

Counts fifty-six (56) to seventy-five (75) charge Whorley with violating § 1462 by using a computer to transmit and receive sexually explicit e-mails with another adult.[2] It is undisputed that Whorley's counsel failed to raise an issue central to his client's defense, i.e., that the e-mails were pure speech protected by the First Amendment. While my colleagues have exercised their discretion and chosen not to address this issue, the grave ramifications of the majority's decision, combined with the fact that the defendant was sentenced to twenty years of imprisonment, compels me to do so.

The Supreme Court, citing to Federal Rule of Criminal Procedure 52(b), has provided guidance for appellate courts when the parties fail to raise an issue of crucial importance. In

---

[2]"E-mail enables an individual to send an electronic message—generally akin to a note or letter—to another individual . . . ." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 851 (1997).

*United States v. Olano*, the Court held that "[i]f the forfeited error is plain and affects substantial rights, the court of appeals has authority to order correction." 507 U.S. 725, 735 (1993). As I discuss *infra*, I believe that the district court erred by not dismissing these charges because the e-mails were clearly pure speech protected by the First Amendment. The error is "obvious," *id.* at 734, because the Supreme Court has never come close to holding that the private fantasies of an adult are not protected by the First Amendment. Unless the Supreme Court chooses to grant certiorari, the majority decision today will chill the expression and innovativeness of private citizens throughout the Fourth Circuit. In addition, this error clearly "prejudiced," *id.*, Whorley as he was convicted and sentenced based on this error. As a result, there can be no doubt that Whorley's conviction resulted in a "miscarriage of justice." *Id.* at 736.

The content of the e-mails can be described as "a series of engaging in fantasies on the internet of one person talking about their fantasy, and another asking questions about what they've done, what they haven't done." (J.A. 155.) The e-mails did not include any visual depictions or attachments containing child pornography of any type, and the Government does not allege that Whorley used the e-mails to convince or lure a child into any sexual activity. In both *Ferber* and *Osborne*, the government's interest in suppressing the speech in question had "a proximate link to the crime from which it came." *Free Speech Coalition*, 535 U.S. at 250. The Supreme Court was concerned with the potential victims of those crimes, i.e., children, and "[i]t did not suggest that, absent this concern, other governmental interests would suffice." *Id.*; *see also id.* at 250-51 ("*Ferber*'s judgment about child pornography was based upon how it was made, not on what it communicated."). The economic and social justifications for regulating e-mail fantasies — even those involving activities that would be criminal if the fantasies were acted out — are minimal. Indeed, the harm, if any, involved in Whorley's conduct is not readily discernible because the e-

mails were written and exchanged for the sole "enjoyment" of Whorley and his counterpart. Unlike the facts in *Ferber*, this exchange of information did not have any economic consequences on the child pornography trade and real children were not harmed (or even discussed) during the "production" of these e-mails.

The majority resolves this issue by citing the well-known proposition that words can be obscene. *See, e.g.*, *Kaplan v. California*, 413 U.S. 115, 119 (1973) ("Obscenity can, of course, manifest itself . . . in the written and oral description of conduct. The Court has applied similarly conceived First Amendment standards to moving pictures, to photographs, and to words in books.") However, simply because words *can* be obscene is not sufficient, on its own, to criminalize pure speech.

Incest and sexual relationships between children and adults are distasteful subjects to most individuals, yet writers routinely publish such material. In fact, Whorley's creative writing and English literature expert wrote a dissertation entitled *Dipping into Chaos, Incest and Innovation in the Narrative Form in Twentieth Century Literature* which explored how "certain authors have used incest as a motif and as a plot element in which they break taboo in order to experiment artistically with language and with the form of a novel." (J.A. 748.) The expert provided the district court with numerous examples of recognized writings involving child sex with adults and/or incest including: Sigmund Freud's writings on incest and fantasies, Alice Walker's *The Color Purple*, and William Faulkner's *Absalom, Absalom!* (described by Oxford University Press ("OUP") as "one of the leading American novels of the twentieth century," OUP, *http://www.oup.com/us/catalog/ general/subject/LiteratureEnglish/AmericanLiterature/20thC/ ~~/dmlldz11c2EmY2k9OTc4MDE5NTE1NDc4OA==?view =usa&ci=9780195154788#Description* (last visited June 8, 2008).

One need not delve into the rare archives of the Library of Congress to find works describing an adult's sexual fantasies about children. Some of these writings, *Lolita* for example, are seated at the head table of great literary works of all time. *See, e.g.*, Time.com, *All-Time 100 novels*, *http://www.time.com/time/2005/100books/the_complete_list.html* (last visited July 10, 2008). The subject of adults fantasizing about having sex with minors, or alternatively, adults actually consummating relationships with children, is not limited to popular literature and academic discourse. A central theme of the Academy Award winner *American Beauty* (DreamWorks 1999) is a forty-two year old man's sexual fantasies about his teenage daughter's high school classmate.

Comparing Whorley's writing with recognized literary works and Academy Award winners raises the question of whether his work is within a zone of expression accepted as having artistic value. By utilizing classic literary devices, writers like Nabakov were able to insulate the reader from the disagreeable nature of the subject matter. *See, e.g.*, Amazon.com, *Editorial Review of Lolita*, *http://www.amazon.com/Lolita-Vladimir-Nabokov/dp/0679723161* (last viewed on July 8, 2008) ("Lolita is undoubtedly, brazenly erotic, but the eroticism springs less from the 'frail honey-hued shoulders . . . the silky supple bare back' of little Lo than it does from the wantonly gorgeous prose that Humbert uses to recount his forbidden passion."). Distinguishing writings based upon an author's ability to distract the reader's instinctual repugnance to a taboo subject by the use of "gorgeous prose" or literary devices is inconsistent with the thrust of the creative writing genre which allows "writers such as Hemingway [to] strip down language, remove symbolism, metaphor, alliteration; all those things to try to get a pure language," and authentic artistic expression. (J.A. 776.)

From my perspective, the iconic books and movies above render unsustainable the claim that writings describing sexual acts between children and adults, generated by fantasy, have

no demonstrated socially redeeming artistic value. If the writers of the aforementioned books and movie scripts e-mailed the sections of their work that described the sexual relationship between the minor and the adult to a willing recipient, presumably both the writer and the recipient could have been subject to prosecution for sending or receiving obscene material under § 1462, an untoward result.

In addition, while published books and finished movie scripts are complete works, such that the fantastical sexual relationship between the child and adult can be analyzed in context, e-mails are rarely comprehensive. Whorley's correspondence was interrupted and as a result, we have an incomplete picture of the purpose behind the e-mails. It is clear, however, that like the literature and movies cited herein, Whorley's fantasies "creat[ed] no victims by its production." *Free Speech Coalition*, 535 U.S. at 250.

There is a discernable group of individuals that does "flirt" with child pornography, *Free Speech Coalition*, 535 U.S. at 245, though they manage to keep their fantasies pent up. Whorley's e-mail fantasies, if carried to fruition, would undoubtedly subject him to criminal liability. But just as the "fantasies of a drug addict are his own and beyond the reach of government," *Paris Adult Theatre I*, 413 U.S. at 67, the fantasies of a child pornographer should be as well. With the exception of the crime of conspiracy, the government cannot criminalize the mere communication of ideas. "Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it," *Roth*, 354 U.S. at 514 (Douglas, J., dissenting); as none of the children discussed in the fantasies exist, Whorley's actions can easily be separated from the *potentially* illegal acts about which he fantasized.

Incursions on our citizenry's right to be free from governmental regulation of speech are viewed with skepticism and scrutiny. *See Roth*, 354 U.S. at 488 ("Ceaseless vigilance is

the watchword to prevent [the First Amendment's] erosion by Congress or by the States."). Whorley's e-mails are pure speech at the very heart of the First Amendment. "To protect speech for its own sake, the Supreme Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct." *Free Speech Coalition*, 535 U.S. at 253 (citations omitted); *see also*, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 66 (1976) ("The question whether speech is, or is not protected by the First Amendment often depends on the content of the speech."). The textual e-mails expressed Whorley's and his adult counterpart's fantastical desires to engage in sexual relations with children. Despite the repugnant nature of such ideas, "[a]ll ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the [First Amendment], unless excludable because they encroach upon the limited area of more important interests." *Roth*, 354 U.S. at 484. Frankly, I am hard pressed to find a permissible governmental interest that is served in suppressing Whorley's e-mails as such an action would not aid in "protect[ing] the victims of child pornography" or the "destr[uction] [of] a market for the exploitative use of children." *Osborne,* 495 U.S. at 109. The most obvious interest the government might have in suppressing such speech — that such fantasies may "whet[ ] the appetites of pedophiles and encourage[ ] them to engage in illegal conduct," *Ashcroft*, 535 U.S. 253, has been soundly rejected by the Supreme Court.

Therefore, I find that this statute, as applied to Whorley, criminalizes protected speech and "is a stark example of speech suppression," *Free Speech Coalition*, 535 U.S. at 24. Consequently, I would reverse his convictions as to counts fifty-six (56) to seventy-five (75) on the basis that the conviction was plainly erroneous because the defendant's e-mail fantasies are a form of pure speech protected by the Constitution and not within the reach of 18 U.S.C. § 1462.

### III.

Whorley contends that 18 U.S.C. § 1466A(a)(1)[3] of the PROTECT Act of 2003, as applied to him, is unconstitutional because it requires an actual minor child and not a fictional character. My colleagues in the majority disagree, holding that the "clear language" of the statute is "sufficiently broad to prohibit receipt of obscene cartoons." (Maj. Op. 14.) Although I do not find that the statute is constitutionally infirm, I interpret subsection (a)(1) to only criminalize material, including cartoons and drawings, that incorporates actual children, even if those children cannot be conclusively identified. Because it is undisputed that real children are not included in the Japanese Anime cartoons Whorley received, I would reverse Whorley's conviction as to counts twenty-one (21) through forty (40).

A straightforward reading of the statute reveals that subsection (a)(1) requires receipt of a pornographic article depicting an actual minor "engaging in sexually explicit conduct" for an individual to be ensnared within its web. Stressing that the phrase "sexually explicit conduct" includes "*persons* of the same or opposite sex" (Maj. Op. 13 (quoting 18 U.S.C. § 2256) (emphasis in original)), the majority apparently believes that a "person" includes both real and fictitious children. I disagree. First, 18 U.S.C. § 2232 defines minor as "any person under the age of eighteen years." A person is defined

---

[3](a) In general—Any person who, in a circumstance described in subsection (d), knowingly produces, distributes, receives, or possesses with intent to distribute, a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting, that—

(1)(A) depicts a minor engaging in sexually explicit conduct;

and

    (B) is obscene;

A(b)(1), including the penalties provided for cases involving a prior conviction.

as a "living human being" and "a human being . . . with legal rights and duties." *Webster's II New Riverside University Dictionary* 877 (1994); *see also*, *Black's Law Dictionary* 1178 (8th ed. 2004) (defining "person" as synonymous with "natural person"). A child that is a figment of an illustrator's imagination is not living, is not a human being with legal rights, and is certainly not natural in the legal sense of the word. *See Black's Law Dictionary* 1178 (8th ed. 2004) (defining "natural" as "brought about by nature as opposed to artificial means"). Thus, for example, the conviction of an individual for receiving a sexually explicit obscene caricature of an actual person under the age of eighteen years would be appropriate under this statute.

Second, the majority concludes that Whorley "overlooks" 18 U.S.C. § 1466A(c) which provides that the Government does not have to prove that "the minor depicted" in the cartoons "actually exist[s]." The intent of subsection (c) is to relax the evidentiary requirements necessary to find an individual guilty under this statute, thus relieving the Government from the burden of exhaustively searching the country to identify conclusively the children involved in the production of the child pornography. *See* Senate Report No. 108-2 at *5 (February 11, 2003) ("[P]rosecutors typically are unable to identify the children depicted in child pornography. Not surprisingly, these children are abused and victimized in anonymity, even when the child pornography is produced within the United States.").[4]

Third, a comparison of the elements contained in subsections §§ 1466A(a)(1) and (a)(2) reveal that the only way to avoid making subsection (a)(2) superfluous is to assume that Congress only required a real child in subsection (a)(1). For example, subsection (a)(1) only requires "sexually explicit con-

---

[4]Under subsection (c), the fact that a child did not "actually exist" — i.e., he or she had passed away — would not impede the prosecution of an individual under this statute.

duct,"[5] which includes the broad category of "lascivious exhibition of the genitals or pubic areas" of a child; subsection (a)(2), on the other hand, criminalizes a more limited type of conduct — i.e., "graphic bestiality, sadistic or masochistic abuse, or sexual intercourse." Thus, the standard under subsection (a)(1) is less demanding, presumably because the conduct involves the abuse of real minors.

For these reasons, I would find that § 1466A(a)(1) is not applicable to Whorley, and reverse his convictions as to counts twenty-one (21) through forty (40).

## IV.

The majority rejects Whorley's contention that the district court abused its discretion by not including a more detailed definition of "as a whole" when instructing the jury on the *Miller* obscenity test. Because an instruction placing the *Miller* formula in the context of the internet would have been useful to the jury in this case, Whorley's objection merits further discussion.

Whorley asked the district court to emphasize, with respect to the third part of the *Miller* test, that "as a whole" meant the

---

[5]18 U.S.C. § 2256 defines "sexually explicit conduct" as:

(i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited;

(ii) graphic or lascivious simulated;

(I) bestiality;

(II) masturbation; or

(III) sadistic or masochistic abuse; or

(iii) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.

"entire work, book, movie, magazine, or story from which the matter in question is derived. Taking a single picture or group of pictures from a body of work does not constitute the whole of the work, just as a single passage from a book or story does not constitute the whole book or story." (J.A. 218K.) The district court rejected Whorley's suggestion because the jury could use its "own common sense and logic in determining what the word as a whole means." (J.A. 794.)

Under our Circuit precedent:

> A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.

*United States v. Lewis*, 53 F.3d 29, 32-33 (4th Cir. 1995) (internal quotation marks and citations omitted). Whorley's additional instruction is consistent with the law, although under most circumstances, the typical regurgitation of the *Miller* standard is sufficient to convey to the jury that it must consider the specific material at issue in the context of the entire work from which it came. However, when dealing with a medium — the web — that is still not used by one-fifth of the U.S. population, *see, e.g.*, Reuters.com, *Poll finds nearly 80% of U.S. adults go online*, *http://www.reuters.com/article/internetNews/idUSN0559828420071106?feedType=RSS& feedName=internetNews&sp=true* (last viewed on June 30, 2008), Whorley's general contention that the district court should have provided more guidance on this matter warrants attention. Indeed, it is reasonable to ask whether a district court should assume that all the jurors understood, for example, the difference between a webpage (one part of a website) and a website. This is particularly true in this case where the

forensic evidence was hardly definitive. Nevertheless, since Whorley's requested instruction did not address the internet, I agree that the instructions "substantially covered" Whorley's requested instruction, and as a result, it did not impair his ability to conduct his defense.

V.

Because I would reverse Whorley's conviction as to counts twenty-one (21) through forty (40), and counts fifty-six (56) through seventy-five (75), I would remand the case to the district court to review its sentence. It is true that the sentences for counts fifty-six (56) through seventy-five (75) ran concurrent to counts one (1) through twenty (20), and the sentence for counts twenty-one (21) through forty (40) ran concurrent to the sentence for counts forty-two (42) through fifty-five (55), but the reversal of forty counts is a significant event that would require the district court to determine whether the overall sentence, and in particular, the upward departure, was appropriate.

VI.

Today, under the guise of suppressing obscenity — whatever meaning that term may encompass — we have provided the government with the power to roll back our previously inviolable right to use our imaginations to create fantasies. It is precisely this unencumbered ability to fantasize that has allowed this nation to reap the benefits of great literary insight and scientific invention. The Constitution's inviolable promise to us is its guarantee to defend thought, imagination and fantasy from unlawful governmental interference regardless of whether such thoughts, imaginings, or fantasies are popular with the masses. It is in these moments that our grip on the rule of law and our fidelity to constitutional values is tested.

Thus, with all due respect to my colleagues, I dissent from the majority's affirmance of Whorley's convictions as to

counts twenty-one (21) through forty (40), and counts fifty-six (56) through seventy-five (75) and concur in the majority's judgment affirming Whorley's convictions as to the remaining counts.